1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FRANCIS DROUILLARD, et al.,

Plaintiffs,

v.

LYNDA ROBERTS, et al.,

Defendants.

Case No.  24-cv-06969-CRB

**ORDER DENYING APPLICATION FOR TEMPORARY RESTRAINING ORDER**

The pro se Plaintiffs in this case are "California residents and registered voters." FAC (dkt. 9) ¶ 5.[1]  They sue Defendants Lynda Roberts, Marin County Registrar of Voters, and Shirley Weber, Ph.D., California Secretary of State, alleging that Defendants are violating the Fourteenth Amendment, the National Voter Registration Act ("NVRA"), and the Help America Vote Act ("HAVA") by failing to remove ineligible voters from Marin County's voter rolls in connection with the November 5, 2024 General Election.  Id. ¶¶ 1, 2, 8.  Plaintiffs seek a Temporary Restraining Order ("TRO"), asking the Court to intervene in the election, which is already well underway.  See App. for TRO (dkt. 10); Proposed Order (dkt. 15) ¶ 1 ("Defendants have begun processing ballots at the Marin County Civic Center.").  Defendants have responded, see Opp'n (dkt. 20), and the Court held a hearing on Monday, November 4, 2024, see Motion Hearing (dkt. 29).  For the reasons discussed below, the Court DENIES the application for a TRO.

---

[1] Plaintiffs are Francis Drouillard, Mark Galperin, John Turnacliff, Chris Carpiniello, Walter Jensen, Matthew Bennett, and Mia Camera.  Id.  Plaintiffs do not identify themselves as part of any organization, and do not bring suit on behalf of any organization.

## I.     BACKGROUND

In a sparse complaint, Plaintiffs allege that "Marin County's voter rolls included numerous ineligible voters who had either moved out of state or were otherwise unqualified under state and federal law."  FAC ¶ 8.  Plaintiffs further allege that Defendants failed "to remove ineligible voters from the rolls," id. ¶ 14, "fail[ed] to implement" "programs to ensure only eligible voters remain on voter registration rolls," id. ¶¶ 16–17 (citing 52 U.S.C. § 20507(a)(4) and (b)), and allow an "excessive number of ballot errors" in Marin County's voting systems, id. ¶ 20.  In their memorandum in support of their application for a TRO, Plaintiffs add some flesh to the bones of their complaint.  See Mem. (dkt. 10-1) ¶¶ 7–24.  They explain that they participated in an effort by "a volunteer group called 'Patriot Force California'" to compare "active county voter rolls" with the National Change of Address ("NCOA") database in order "to identify active voters on California's registered voter rolls that moved to another state before the March 5, 2024[] primary."  Id. ¶ 8.

Plaintiffs assert that "[i]n the 2024 Primary Election, 337 ballots were sent to individuals who moved out of state, and 48 of those ballots were returned and counted anyway."  Id. ¶ 2.  "Plaintiffs Drouillard, Turnacliff, Bennett and Camera were among the group of canvassers for Marin County who went door to door" in Marin "to confirm the accuracy of" those numbers.  Id. ¶ 9.  They were only able to check 145 of the 337 names.  Id.  Of those 145 names, Plaintiffs assert that 140 had in fact moved.  Id. (citing Drouillard Affidavit).  (In fact, Drouillard's Affidavit asserts that of the 145 names, "131 had indeed moved."  See Drouillard Affidavit (dkt. 10-2) ¶ 9.)  Plaintiffs assert that "[D]efendants were given the names of the 337 registered voters that moved from the state and told that 140 of these were personally confirmed by plaintiffs."  Mem. ¶ 13; see also Drouillard Aff. Ex. F (dkt. 11-6).[2]  "On September 27, 2024, Defendant Roberts responded but failed to address the issue of ineligible voters . . . in violation of her duty to investigate all such

---

[2] This letter was sent on Marin Election Integrity Committee letterhead to Roberts from Drouillard, who identified himself in the letter as Chair of the Marin Election Integrity Committee.  See id. at 4.

claims." Mem. ¶ 14; see also Drouillard Aff. Ex. G (dkt. 11-7).[3] "On October 1, 2024, plaintiffs again contacted Roberts," and did not get a satisfactory response. Mem. ¶ 15; see also Drouillard Aff. Exs. H (dkt. 11-8),[4] I (dkt. 11-9).[5]

As to the 2024 General Election, Plaintiffs assert on information and belief "that there were 337 out-of-state and 1,162[6] out-of-county active registered voters on [the] Marin County voter rolls." Mem. ¶ 19. They further assert that Drouillard examined the September 30, 2024 voter rolls, and that 89 of the 131 "confirmed out-of-state voters," and 994 of the 1,162 "alleged out-of-county voters" remained on the voter rolls. Id. ¶¶ 21, 22. Marin County mailed ballots to voters beginning on October 7, 2024. Id. ¶ 16. Plaintiffs assert that Tony Aquilino, a Marin County elections employee, confirmed that active voters on the September 30, 2024 voter rolls would be mailed ballots. Id. ¶ 23. Plaintiffs

---

[3] In this letter, Roberts stated that the Marin County Elections Department "follows the law to continually process changes to the voter registration database." Id. at 1. She also took issue with the Marin Election Integrity Committee reports, which she said "contain inaccurate and misleading information." Id. Roberts explained that the reports were based on December 2023 data, which is outdated. Id. Roberts also stated that there are multiple lawful "circumstances under which voters may retain a local address and live out of state," such as being temporarily away while attending school or serving in the military. Id. at 2.

[4] In this letter, on Marin Election Integrity Committee letterhead, Drouillard wrote to Roberts that he "provided evidence of 337 active registered voters that were ineligible to vote" because they moved out of state, 140 of whom were verified by canvassers. See id. at 1. Drouillard wrote that of the 337, "219 remain on the voter rolls extracted September 30, 2024," and that of the 140, "89 remain on the voter rolls." Id. Drouillard asserted in the letter that Roberts was failing to comply with the NVRA, and that "removing ineligible voters is not subject to the so-called 'Quiet-Period' of NVRA." Id. at 2.

[5] This is a memo from Weber to "All County Clerks/Registrars of Voters" dated September 27, 2024, which Roberts apparently emailed to Drouillard. See Drouillard Aff. ¶ 20 (explaining Exhibit I). Weber wrote in the memo about "pre-election challenges by members of the public" ahead of the General Election, specifically addressing "demands for the immediate removal of voters." Drouillard Aff. Ex. I at 1. The memo addressed a number of different kinds of challenges, and problems with those challenges, stating that the NVRA "governs the manner and timing of removing a person's name from voter registration rolls" Id. at 2. It also noted that "the NVRA establishes a 90-day 'quiet period' or 'blackout' period prior to each primary or general federal election, during which election officials are prohibited from processing and removing the names of ineligible voters from the state's voter rolls as part of their normal list maintenance programs." Id. at 3. And it stated that "a voter may be removed from the voter rolls due to a change in their residential address outside of the jurisdiction only" in certain circumstances. Id.

[6] The 1,162 number comes from Larry Maloney, "an enthusiast about voter integrity" and member of Patriot Force California. See Maloney Aff. (dkt. 10-3) ¶¶ 4, 5. He "personally used [his] software to pull the names of 337 voters" for the canvasing project, and "personally generated the list of 1,162 voter names using the NCOA database, and the August 15, 2024[] voter rolls." Id. ¶¶ 5, 6.

argue that "[i]f only a small fraction of ineligible voters cast ballots in the November 5, 2024[] General Election, then excessive ballot errors will occur that render the election results unreliable." Id. ¶ 24.  They further assert that they "expect 142 of them to be cast and counted," adding that the "maximum [number of] errors permitted in Marin is 15." Id. ¶¶ 3, 4.[7]

On October 4, 2024, Plaintiffs brought suit against Defendants for declaratory and injunctive relief, alleging violations of (1) the Equal Protection Clause; (2) NVRA; and (3) HAVA.  See Compl. (dkt. 1).  Plaintiffs amended the complaint on October 12, 2024, maintaining the same three causes of action.  See FAC.  Plaintiffs then filed an application for a TRO on October 24, 2024.  See App. for TRO.[8]  Plaintiffs submit with their application a Proposed TRO that would (1) order Defendants "to intercept and sequester ballots returned by ineligible voters" and (2) enjoin Defendants "from opening envelopes of ballots returned by ineligible voters, or processing or counting those ballots."  See Proposed TRO (dkt. 10-4).[9]  Defendants have responded, see Opp'n, and the Court held a hearing earlier today, see Motion Hearing.[10]

---

[7] It is not clear where this 142 number comes from.  Plaintiffs characterize it as "a fair estimate." Id. ¶ 4.

[8] The application for a TRO appears on the docket twice, at dkt. 10 and dkt. 12.

[9] The memorandum in support of the application for a TRO includes an additional remedy that is not included in the Proposed TRO.  It states: "To safeguard against inauthenticity, plaintiffs are requesting real-time AVMR-130 reports at regular intervals which will show the number of ballots challenged and sequestered for verification. . . . Once verified that they're from ineligible voters they should remain sequestered, unopened and uncounted." Mem. ¶ 6.  Plaintiffs explain that "An AVMR-130 is a report that provides the number of returned vote-by-mail ballots sorted up until the time the report was produced as well as the party of the voter and whether the ballot is 'good,' 'challenged' or 'undeliverable.'" Id. ¶ 18.

[10] On October 28, 2024, Plaintiffs filed a Proposed Order that would have enjoined Defendants from "opening and counting any ballots received between now and the [November 4, 2024] hearing."  Proposed Order (dkt. 15) ¶ 3.  The Court declined to enter that Proposed Order.  See Order Denying Request to Enter Proposed Order (dkt. 17).  On October 31, 2024, Plaintiffs filed an Application to Stay, which also requested significant injunctive relief, including the interception and sequestering of ballots from "ineligible voters" and the enjoining of opening, processing, or counting of ballots from "ineligible voters."  See App. for Stay (dkts. 23, 26); Proposed Order for Judge (dkt. 24) ¶ 1.  On November 1, 2024, the Court held that it would "not issue the requested stay or the requested injunctive relief in advance of the hearing on Monday, November 4, 2024."  See Order re Filings re Application for Stay (dkt. 27).

United States District Court
Northern District of California

## II.    LEGAL STANDARD

A TRO is an "extraordinary remedy" that should be awarded only upon a clear showing that the party is entitled to such relief.  See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).  The party seeking a TRO must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest.  See id. at 20.  Alternatively, the moving party must demonstrate that "serious questions going to the merits were raised," that "the balance of hardships tips sharply in the [petitioner's] favor," and that the other two Winter elements are satisfied. All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (quotation omitted).  The "[l]ikelihood of success on the merits 'is the most important Winter factor.'"  Disney Enters., Inc. v. VidAngel, Inc., 869 F.3d 848, 856 (9th Cir. 2017) (quoting Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015)).  Courts may analyze a TRO request using a sliding scale approach through which the elements of the "test are balanced, so that a stronger showing of one element may offset a weaker showing of another."  See Armstrong v. Cnty. of Placer, No. 22:1-cv-00779-KJM-KJN, 2021 WL 2258716, at *3 (E.D. Cal. May 3, 2021) (citing All. for the Wild Rockies, 632 F.3d at 1131).

Plaintiffs seeking "mandatory injunctions," which "order[] a responsible party to take action," must clear a higher threshold than plaintiffs seeking prohibitory injunctions, which preserve the status quo.  See Hennessy-Waller v. Snyder, 529 F. Supp. 3d 1031, 1036–37 (D. Ariz. 2021) (internal quotation marks omitted), aff'd sub nom. Doe v. Snyder, 28 F.4th 103 (9th Cir. 2022).  Mandatory injunctions are "particularly disfavored" and "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases."  Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 879 (9th Cir. 2009) (internal quotation marks omitted).

## III.    DISCUSSION

Plaintiffs argue that the Court should issue the requested TRO because (A) they

5

have standing to bring suit and (B) they have satisfied the <u>Winter</u> factors. <u>See</u> Mem. The Court disagrees on both points.

**A.    Standing**

Plaintiffs argue that they have standing because their "constitutional right to vote is impaired by the dilution of their vote resulting from counting votes of ineligible voters." Mem. ¶ 26; <u>see also</u> <u>id.</u> ¶ 25 ("a loss of a constitutional right constitutes actual injury.").[11] "The question of whether a party has standing to sue under Article III is a threshold issue that must be addressed before turning to the merits of a case." <u>Shulman v. Kaplan</u>, 58 F.4th 404, 407 (9th Cir. 2023) (citing <u>Horne v. Flores</u>, 557 U.S. 433, 445 (2009)). In order to have Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 338 (2016). Defendants contend that Plaintiffs fail as to injury and redressability. <u>See</u> Opp'n

---

[11] Plaintiffs argued for the first time in a filing entitled "Proposed Order And Application for Stay," filed at 11:51 p.m. on October 31, 2024 (and therefore after Defendants filed their opposition brief), that they also have standing because "although their papers failed to sufficiently highlight it, . . . two of them are running for public office. Their races will necessarily be affected, and they stand to be injured as a result." App. for Stay ¶ 10; <u>see also</u> Drouillard Decl. ISO Stay (dkt. 25) ¶ 3 ("Plaintiff Mark Galperin and I are candidates for elected office on the ballot in the November 5, 2024 election."). Plaintiffs repeated this basis for standing at the motion hearing. This basis for standing is not in the FAC and not in the application for a TRO or any of the papers supporting the application for a TRO (in fact, in applying for a TRO, Plaintiffs disclaim an interest in the results of the election, <u>see</u> Mem. ¶ 38). Plaintiffs assert that "Although these facts come before the Court for the first time after the defendants' [sic] filed their Opposition, defendants knew this and therefore aren't prejudiced by this Court's consideration of these facts." App. for Stay ¶ 10. Whether or not "defendants knew this," the Court did not. The Court is also entitled to timely notice of the bases of the parties' arguments. This is not an acceptable means by which to introduce evidence in support of the application for a TRO.

Even if the Court did consider this late argument, Plaintiffs have not explained, much less introduced any evidence of, why the two races allegedly involved would "necessarily be affected" by the inclusion of some ineligible votes. Such harm—that Drouillard and Galperin will lose their elections because of ineligible voters—is entirely hypothetical and does not meet the "actual or imminent" requirement for standing. <u>See</u> <u>Bost v. Illinois State Board of Elections</u>, 114 F.4th 634, 641–642 (7th Cir. 2024) ("whether the counting of ballots received after Election Day would cause them to lose the election is speculative at best"); <u>Lujan</u>, 504 U.S. at 560; <u>see also</u> <u>Election Integrity Project California, Inc. v. Weber</u>, 113 F.4th 1072, 1078, 1087 (9th Cir. 2024) (five of the plaintiffs in the amended complaint were "unsuccessful congressional candidates"; Ninth Circuit nonetheless rejected vote dilution theory of harm).

United States District Court
Northern District of California

at 5–6.

### 1. Injury

To satisfy Article III's injury requirement, a plaintiff must show that he suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." Spokeo, 578 U.S. at 339. To be "concrete," it must not be a "bare procedural violation." Id. at 341. "A litigant raising only a generally available grievance about the government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." Hollingsworth v. Perry, 570 U.S. 693, 705 (2013) (internal quotation marks omitted). "A citizen may not sue based only on an asserted right to have the Government act in accordance with law." FDA v. Alliance for Hippocratic Medicine, 602 U.S. 367, 381 (2024) (internal quotation marks omitted). In voting cases specifically, only "voters who allege facts showing disadvantage to themselves as individuals have standing to sue to remedy that disadvantage." Gill v. Whitford, 585 U.S. 48, 65–66 (2018) (cleaned up).

Plaintiffs' assertion of injury here—that their "constitutional right to vote is impaired by the dilution of their vote resulting from counting votes of ineligible voters," Mem. ¶ 26—is plainly inadequate.[12] "[W]hether evaluated in the context of Article III or on the merits, the relevant principle is the same: the mere fact that some invalid ballots have been inadvertently counted, without more, does not suffice to show a distinct harm to any group of voters over any other." Election Integrity Project California, 113 F.4th at 1089 n.13; see also Republican National Committee v. Francisco Aguilar, No. 2:24-cv-

---

[12] Further, any suggestion that Plaintiffs "los[t]" their "constitutional right" to vote, see Mem. ¶ 25, is plainly wrong. Nothing prevents Plaintiffs from voting. See Election Integrity Project California, 113 F.4th at 1089 ("the inadvertent counting of some invalid ballots, without more, does not limit, prevent, or otherwise burden the ability of any voter to cast a lawful ballot.").

United States District Court
Northern District of California

00518-CDS-MDC, 2024 WL 4529358, at *3–4 (D. Nev. Oct. 18 2024) ("Johnston's vote dilution claim is nothing more than a generalized grievance" and "can be raised by every and any voter in the State of Nevada."); Strong Cmtys. Found. of Ariz. Inc. v. Stephen Richer, No. CV-24-02030-PHX-KML, 2024 WL 4475248, at *8 (D. Ariz. Oct. 11, 2024) (rejecting argument, in voter list maintenance action, that individual plaintiff suffered injury "because greater numbers of potentially-ineligible registrants dilute her vote" and explaining that "even if [plaintiff's] vote was 'diluted' in the colloquial sense plaintiffs allege, that type of 'dilution' does not give [her] particularized injury in fact because it is also suffered by every other voter.").

Because Plaintiffs have no particularized injury and sue only "'to have the Government act in accordance with law,'" see Alliance for Hippocratic Medicine, 602 U.S. at 381, they lack standing.

### 2. Redressability

To satisfy Article III's redressability requirement, a plaintiff must show that it "'would benefit in a tangible way from the court's intervention.'" DeFazio v. Hollister, Inc., 636 F. Supp. 2d 1045. 1072 (E.D. Cal. 2009) (quoting Warth v. Seldin, 422 U.S. 490, 508 (1975) and citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court")). Because Plaintiffs waited as long as they did—only contacting Defendants on August 1, 2024 despite their concerns about the March 5, 2024 primary, see Drouillard Aff. ¶¶ 5, 17, only bringing this suit on October 5, 2024, see Compl., only filing an application for a TRO on October 24, 2024, see App. for TRO—the Court could not hear this case (with the benefit of Defendants who had been served and able to respond) before today.

As of today, Marin County has already processed many mail-in ballots. See Roberts Decl. (dkt. 20-1) ¶ 9 (process "began as soon as mail-in ballots were returned in October"), ¶ 10 ("As of 1:00 p.m. October 30, 2024, 63,389 ballots have been accepted" and "[o]ver 32,500 ballots have been tabulated as of 1:00 p.m. October 29, 2024."), ¶ 11

("I estimate that as of 10:00 a.m. on November 4, 2024, over 80,000 ballots in Marin County will be accepted and over 65,000 ballots in Marin County will be tabulated."); <u>see also</u> Proposed Order ¶ 1 ("Defendants have begun processing ballots at the Marin County Civic Center.").  In the course of processing mail-in ballots, the ballots are "removed from their return envelopes" and "the ballots are anonymous and cannot be tied to a specific voter."  Roberts Decl. ¶ 5; <u>see also</u> Proposed Order ¶ 1 ("Plaintiffs are concerned that ballots extracted before the hearing will prejudice this Court's ruling because once separated from the yellow return envelope it will be impossible to determine whether a ballot was cast by an ineligible voter.").

Because, as Plaintiffs acknowledged at the motion hearing, many mail-in ballots have already been removed from their envelopes, it is too late for the Court to order Defendants "to intercept and sequester ballots returned by ineligible voters" and to enjoin Defendants "from opening envelopes of ballots returned by ineligible voters, or processing or counting those ballots."  <u>See</u> Proposed TRO.  Any injury is no longer redressable.[13]  For that reason as well, Plaintiffs lack standing.

### B.    Merits

Even assuming that Plaintiffs had standing, the Court concludes that Plaintiffs fail to satisfy the <u>Winter</u> factors for injunctive relief.

### 3.    Likelihood of Success on the Merits

A party seeking a TRO must establish a likelihood of success on the merits. <u>Winter</u>, 555 U.S. at 20.  Plaintiffs argue that they are likely to succeed on (a) their Equal Protection, Substantive Due Process, and Procedural Due Process claims; (b) their NRVA claim; and (c) their HAVA claim.  <u>See</u> Mem. ¶¶ 28–37.  As an initial matter, this is

---

[13] This is also true in light of the 90-day quiet period mandated in the NVRA, discussed below.  Plaintiffs' request that the Court enjoin Defendants from opening or processing or counting ballots, <u>see</u> Proposed TRO ¶ 5, would have the effect of removing those voters from the voter rolls, <u>see</u> <u>Republican National Committee v. Francisco Aguilar</u>, 2024 WL 4529358, at *8 ("any part of plaintiffs' request that defendants make reasonable efforts to conduct voter-list maintenance that involves removing voters ineligible due to their change in address is barred under Article III because it lacks redressability" in light of "90-day blackout window").

problematic because the complaint <u>does not include any Due Process claims</u>.  <u>See</u> FAC.  It includes three claims: "Violation of the  Fourteenth Amendment (Equal Protection)," "Violation of the National Voter Registration Act," and "Violation of the Help America Vote Act."  <u>Id.</u> ¶¶ 12–20.  While courts are to hold a complaint by a pro se plaintiff to a less stringent standard than one drafted by a lawyer, <u>see</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007), courts may not "supply essential elements of the claim that were not initially pled," <u>Ivey v. Bd. of Regents of Univ. of Alaska</u>, 673 F.2d 266, 268 (9th Cir. 1982).  Plaintiffs are unlikely to succeed on claims not found within their complaint.  <u>See</u> <u>Jones v. Pollard</u>, No. 21cv162-GPC(BGS), 2023 WL 4728802, at *2 n.4 (S.D. Cal. July 24, 2023) (declining to address claim that was not in complaint).  Nevertheless, the Court will address each of the claims that Plaintiffs argue in their memorandum in support of their application for a TRO.

### a.   Equal Protection, Substantive Due Process, Procedural Due Process

#### i.   Equal Protection

The FAC alleges that the Equal Protection Clause "safeguards voters from dilution of their votes by unlawful votes cast by ineligible voters."  FAC ¶ 13 (citing <u>Reynolds v. Sims</u>, 377 U.S. 533, 554–55 (1964)).  It then alleges that "[b]y failing to remove ineligible voters from the rolls, Defendants have sanctioned election practices that reduce the weight and impact of votes cast by eligible voters, depriving Plaintiffs of equal protection under the law."  Id. ¶ 14.  In seeking a TRO, Plaintiffs add only that "'[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.'"  Mem. ¶ 28 (quoting <u>Bush v. Gore</u>, 531 U.S. 98, 104–05 (2000); citing <u>Hunter v. Hamilton Cnty. Bd. of Elections</u>, 635 F.3d 219, 234 (6th Cir. 2011)).

This is very similar to the theory that the Ninth Circuit rejected in <u>Election Integrity Project California</u>, 113 F.4th 1072, a case about the administration of the 2020 General Election in California.  In that case, the plaintiff alleged that defendants (including Weber,

10

a defendant here) "have 'diluted' the voting power of in-person voters and voters of certain counties by failing to adequately police ballots cast by mail." Id. at 1082.  The court explained that "[a]ssuming that California officials have inadvertently counted some invalid [vote by mail] ballots in the past, the effect that counting such ballots had on the relative voting power of all votes was the same, regardless of voting method or geography." Id.  Because "[a] vote dilution claim requires a showing of disproportionate voting power for some voters over others," the plaintiff failed.  Id.  The court reviewed the foundational vote dilution cases, and explained that "the crux of a vote dilution claim is inequality of voting power—not diminishment of voting power per se." Id. at 1087 (explaining that "dilution of voting power, in an absolute sense, occurs any time the total number of votes increases in an election").  The plaintiff's theory of vote dilution failed because "[a]ssuming that some invalid [vote by mail] ballots have been mistakenly counted as [the plaintiff] allege[d], any diminishment in voting power that resulted was distributed across all votes equally." Id.; see also id. at 1089 n.13 ("To our knowledge, every court to have considered a 'vote dilution' claim analogous to the one raised by [the plaintiff] in this case has rejected the claim.").

Here, as in Election Integrity Project California, Plaintiffs do not allege "that any specific candidate, issue, party, or other cognizable class of voters has disproportionately benefitted from or suffered injury as a result of the invalid ballots that it alleges officials have mistakenly [sent to voters]." See id. at 1088; FAC ¶ 13.  Alleging that their votes were diluted because of the inclusion of ineligible voters on the voting rolls is not enough. See Election Integrity Project California, Inc., 113 F.4th at 1095–96.  Accordingly. Plaintiffs are not likely to succeed on their Equal Protection claim.

### ii.    Substantive Due Process

The FAC does not include a Substantive Due Process claim.  See FAC.  In seeking a TRO, however, Plaintiffs argue for the first time that Defendants violated their right to Substantive Due Process—because the election is being "'conducted in a manner that is fundamentally unfair.'"  Mem. ¶ 29 (quoting Bennett v. Yoshina, 140 F.3d 1218, 1226 (9th

Cir. 1998)).  Plaintiffs recognize that there is a "distinction between 'garden variety' election irregularities," which do not implicate Substantive Due Process, and "a pervasive error that undermines the integrity of the vote," which does.  Id.  Plaintiffs contend that the Due Process Clause is implicated here because the election in Marin County has "more than a few minor irregularities" and indeed "may contain well beyond 10,000 errors."  Id. ¶¶ 29, 30.[14]

Election Integrity Project California is also helpful on this issue.  The plaintiffs there argued that election irregularities were so pervasive that they undermined fundamental fairness.  Election Integrity Project California, 113 F.4th at 1096.  The Ninth Circuit explained that garden variety irregularities "reasonably associated with the public administration of elections" do not violate the Due Process Clause, even when they control the outcome of an election.  Id.  It observed that "[g]arden variety irregularities have historically included . . . '[m]ere fraud or mistake,' claims of lax security,' absentee ballots delivered by persons other than the voter, human and/or mechanical error resulting in miscounted ballots . . . the counting of some votes that were illegally cast, . . . and the mistaken allowance of non-party member votes in a primary election."  Id. (internal citations omitted) (emphasis added).  Irregularities that went beyond "garden variety" included "the disenfranchisement of an entire electorate through the failure to hold a legally required election, 'outrageous racial discrimination' resulting in a complete 'lack of integrity' in the election, and knowing efforts by election officials 'to prevent an honest count . . . of the votes lawfully cast' in an election."  Id. at 1096–97 (internal citations omitted).  The Ninth Circuit concluded that the allegations there—including that "thousands of ineligible registrants have incorrectly remained on the voter rolls" and that "thousands of [vote by mail] ballots have been mailed to . . . individuals who were likely

---

[14] Plaintiffs do not explain how they get to "well beyond 10,000 errors," and it is Plaintiffs' burden to support their contentions.  See Winter, 555 U.S. at 20 ("A plaintiff . . . must establish . . ."); see also Wright & Miller, Federal Practice and Procedure § 2949 (3d ed. 2024) ("Evidence that goes beyond the unverified allegations of the pleadings and motion papers must be presented to support or oppose a motion for a preliminary injunction.").

1   ineligible to vote"—did not rise to the level of Due Process violations.  Id. at 1097–98.

2   While such allegations "undoubtedly describe purported errors in the administration of

3   California's elections," they "fail[] to draw a plausible connection between these errors

4   and any 'massive disenfranchisement' of voters or 'pervasive' counting of invalid ballots."

5   Id. at 1098.  The number of invalid ballots alleged to have been counted were "so

6   exceedingly minute as to have no measurable impact" on the fairness of California's

7   election.  Id.

8          Here, setting aside Plaintiffs' unsupported assertion about "10,000 errors," Plaintiffs

9   have asserted only that 89 "confirmed out-of-state voters," and 994 "alleged out-of-county

10  voters" remained on the voter rolls.  Mem. ¶¶ 21–22.  Importantly, there is no reason to

11  believe that these 89 or 994 individuals are all ineligible voters.[15]  Not all voters who

12  change their address are ineligible to vote: a voter does not necessarily lose his residency if

13  he moves to another state, and the California Elections Code specifically allows voters to

14  temporarily change a mailing address but maintain their domicile for purposes of voting if,

15  for example, they are attending school or serving in the military elsewhere.  See, e.g., Cal.

16  Elec. Code. § 2021(a) ("A person who leaves his or her home to go into another state or

17  precinct in this state for temporary purposes merely, with the intention of returning, does

18  not lose his or her domicile."), § 2025 ("A person does not . . . lose a domicile solely by

19  reason of his or her . . . absence from a place while employed in the service of the United

20  States or of this state . . . nor while a student of any institution of learning, nor while kept

21  in an almshouse, asylum or prison."); see also Drouillard Aff. Ex. G at 2 (Roberts

22  explaining this to Drouillard on September 27, 2024).

23         Even accepting the problematic number that Plaintiffs posit, not all 994 ballots will

24  be returned.  Plaintiffs assert without support that they expect 142 of the 994 ballots "to be

25

26  _____

27  [15] It is also unclear whether these numbers are accurate even as a statement of how many voters still on the voting rolls have left the county/state, given Roberts' contention that Plaintiffs' numbers are based on outdated information, extracted in December 2023.  See Drouillard Aff. Ex. G at 1.  Maloney states that the 1,162 number was based on "the August 15, 2024 voter rolls."  Maloney Aff. ¶ 6.

28

13

cast and counted." Mem. ¶ 4. Maloney states that "[a]ny election results which can include votes from even 1/10 of the 994 ineligible voters is a seriously flawed election, on a scandalous level." Maloney Aff. ¶ 8. The Court is unconvinced. 99 ineligible voters would amount to 0.058% of the 172,000 voters currently registered in Marin County. See County of Marin, News Release – Bookmark Our Election Results Webpage, https://www.marincounty.gov/news-releases/bookmark-our-election-results-webpage (visited Oct. 29, 2024) ("Marin County has about 172,000 registered voters for this election."). Presumably not all of the 172,000 registered Marin County voters will vote, however. In 2020, when there were 175,220 registered Marin County voters, there were 158,103 ballots cast, or 90.23%. See County of Marin, Official Final Election Results, https://results.enr.clarityelections.com/CA/Marin/107124/web.264614/#/summary (last updated Dec. 17, 2020). If 90.23% of this year's registered voters vote, that would be 155,195.6 ballots cast.[16] 99 ineligible voters would amount to 0.064% of the voters in Marin County.

While any number of votes by ineligible voters is undesirable, this small a percentage is akin to the "counting of some votes that were illegally cast" example given in Election Integrity Project California, 113 F.4th at 1096–97. The case involving "some votes that were illegally cast" was Pettengill v. Putnam County R-1 School District, Unionville, Mo., 472 F.2d 121 (8th Cir. 1973). See id. at 1096 (citing Bennett v. Yoshina, 140 F.3d 1218, 1226 (9th Cir. 1998) (citing Pettengill, 472 F.2d at 122)). In Pettengill, there were only "five electors personally voting and six electors casting absentee ballots who were not qualified to vote because they did not satisfy the residency requirements prescribed by law" and "two electors [who] were not qualified to vote because they were not of lawful age when they applied for absentee ballots," so just 13 illegal votes. 472 F.2d at 122. But the total number of votes in that case was also small: "1,466 votes were cast in favor of the proposition, [and] 726 [were] cast against," so 2,192 total. Id. 13

---

[16] Roberts estimates that "approximately 143,000 mail ballots will be submitted for this election." Roberts Decl. ¶ 11. She does not estimate the total number of ballots cast.

14

illegal votes is 0.59% of the 2,192 total votes cast—a larger percentage than Plaintiffs hypothesize here, with the 99 invalid votes that Maloney deems "scandalous." See Maloney Aff. ¶ 8.

Moreover, 99 votes from ineligible voters in an election in which 155,195.6 ballots are cast does not represent "the disenfranchisement of an entire electorate through the failure to hold a legally required election," "outrageous racial discrimination," or "knowing efforts by elections officials 'to prevent an honest count . . . of the votes lawfully cast." See Election Integrity Project California, 113 F.4th at 1097. In Bennett, the Ninth Circuit explained that "a court will strike down an election on substantive due process grounds if two elements are present: (1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures." 140 F.3d at 1226–27, n.3. There was "no disenfranchisement or meaningful vote dilution" in that case because "[e]very ballot submitted was counted, and no one was deterred from going to the polls." Id. at 1227. Here too, where no one is disenfranchised by the inclusion of 99 votes by ineligible voters, the election is not fundamentally unfair.

Accordingly, Plaintiffs are unlikely to prevail on a Substantive Due Process claim.

### iii.    Procedural Due Process

The FAC does not include a Procedural Due Process claim. See FAC. In seeking a TRO, however, Plaintiffs argue for the first time that Defendants violated their right to Procedural Due Process because Defendants "knowingly and intentionally departed from the [NVRA], which requires the removal of registrants that moved outside the registrar's jurisdiction, [HAVA], which requires that voter roll databases contain only the registrations of qualified citizens residing in that state, and the Cal. Elec. Code § 349[,] which requires a registrant to reside in the precinct they are registered."[17] Mem. ¶ 33.

---

[17] That is not what California Election Code § 349 says. It says, in part, that "[t]he domicile of a person is that place in which his or her habitation is fixed, wherein the person has the intention of remaining, and to which, whenever he or she is absent, the person has the intention of returning." Cal. Elec. Code § 349(b). That section is consistent with the

Plaintiffs assert that this "dilute[d] every eligible vote," and that "there was no attempt to hold a hearing or to afford plaintiffs an opportunity to be heard." Id.

Defendants argue that any Procedural Due Process claim fails because Plaintiffs are essentially challenging a state's election procedures, which requires Plaintiffs to show that the "nature and extent of the alleged burden on the right to vote" outweighs "the State's interest in maintaining its chosen system of election administration." Opp'n at 10 (quoting Election Integrity Project California, 113 F.4th at 1083). Defendants reason that Plaintiffs' asserted burden—that their votes will be diluted—fails, because the burden on their right to vote is nonexistent. Id. (quoting Election Integrity Project California, 113 F.4th at 1089).

To make out a Procedural Due Process claim, a plaintiff must identify a constitutionally protected liberty or property interest, a deprivation of that interest by the government, and a lack of process. See Shanks v. Dressel, 540 F.3d 1082, 1090 (9th Cir. 2008). Presumably, the interest Plaintiffs point to is their right to vote. But Plaintiffs have not experienced any deprivation of that right. They are able to vote. See Election Integrity Project California, 113 F.4th at 1089. The "inadvertent counting of some invalid ballots" does not "burden the ability of any voter to cast a lawful ballot." Id. This is fatal to any Procedural Due Process claim. Because the government did not deprive Plaintiffs of a liberty or property interest, Plaintiffs were not entitled to any particular process.[18]

Accordingly, Plaintiffs have failed to demonstrate that they are likely to prevail on a Procedural Due Process claim.

---

code sections discussed above, like California Election Code § 2021(a), which allows voters to temporarily change a mailing address but maintain their domicile for purposes of voting if, for example, they are attending school or serving in the military elsewhere. California Election Code § 349 allows for the fact that "[a]t a given time, a person may have more than one residence." Cal. Elec. Code § 349(c).

[18] This is therefore unlike Rivera-Powell v. N.Y.C. Bd. of Elections, 470 F.3d 458, 460–61 (2d Cir. 2006), a case Plaintiffs cite. See Mem. ¶ 32. In Rivera-Powell, 470 F.3d at 460–61, the plaintiff was a candidate for judge, and was removed from the ballot; because the board provided her with a pre-deprivation hearing, the court held that there was no Procedural Due Process violation. Plaintiffs here have not articulated an interest that is anything like a judicial candidate being removed from a ballot.

**b.    NVRA**

The FAC alleges that the NVRA requires states to "conduct programs to ensure only eligible voters remain on voter registration rolls," and that "Defendants' failure to implement these programs . . . has allowed thousands of ineligible voters to remain on the voter rolls."  FAC ¶¶ 16–17.  To be clear: the FAC offers no support for the "thousands of ineligible voters" allegation, and the memorandum in support of the application for a TRO abandons that allegation entirely.  See FAC; Mem.  It states instead that 89 "confirmed out-of-state voters," and 994 "alleged out-of-county voters" remain on the voter rolls.  See Mem. ¶¶ 21, 22.  It also argues that "the Registrar has knowingly and intentionally departed from the [NVRA], 52 U.S.C. § 20507(d), which requires the removal of registrants that moved outside the registrar's jurisdiction."  Id. ¶ 33.  It goes on to state that the NVRA mandates that the state "'shall conduct a general program that makes a reasonable effort to remove the names of ineligible voters . . . by reason of—(A) the death of the registrant; or (B) a change in the residence of the registrant. . . .'"  Id. ¶ 34 (quoting 52 U.S.C. § 20507(a)(4)).  And it argues that "the registrar's complete failure to make a reasonable effort to update the voter rolls, including failure to remove those who have moved out of state . . . is not a reasonable effort to maintain accurate voter rolls."  Id. ¶ 35 (citing Husted v. A. Philip Randolph Institute, 138 S. Ct. 1833 (2018).

But Defendants do have programs in place to remove ineligible voters, as evidenced by some of Plaintiffs' own exhibits.  For example, Roberts wrote to Drouillard on September 27, 2024, stating: "[t]hese record updates are prompted by notification from voters themselves and official government sources, including the United States Postal Service's National Change of Address (NCOA) program."  Drouillard Aff. Ex. G at 1. That letter also stated:

> The Elections Department follows the law to continually process changes to the voter registration database, as required, the include processing canceled and inactive voters, deceased voters, those who haven't voted in two consecutive federal general elections, those who don't provide adequate information on their registration form, and those whose mail is returned as undeliverable.  On average, our staff processes and maintains

United States District Court
Northern District of California

approximately 5,200 records per month.
Id.  The September 27, 2024 memo from Weber to All County Clerks/Registrars of Voters also states that "the Secretary of State and county election officials diligently maintain California's voter rolls using the most recent data available from various government agencies."  Drouillard Aff. Ex. I at 1; see also Drouillard Aff. Ex. J (dkt. 11-10) (8/12/24 Weber memo to All County Clerks stating that "the Secretary of State will continue to provide National Change of Address (NCOA) data to each county elections official").

In connection with their opposition brief, Defendants submitted further evidence of their efforts to maintain accurate voter rolls.  Roberts declared that her office complies with the NVRA, and that the Secretary of State regularly sends Marin County information from NCOA through the statewide voter registration database, pursuant to California law. Roberts Decl. ¶ 3.  Roberts declared that she and her staff take different actions based on whether a voter's changes of address is within Marin, to a different California county, or outside of California.  Id. ¶¶ 3–6.  And Roberts declared that her office takes separate steps if the notice of a change of address comes from a voter him- or herself.  Id. ¶ 7.

Plaintiffs fail to articulate why the efforts described here to maintain Marin County's voter rolls are not "reasonable" or why they do not comply with 52 U.S.C. §§ 20507(a)(4), 20507(c)(1),[19] or 20507(d)(3).  And Defendants' evidence contradicts Plaintiffs' unsupported assertion of a "complete failure to make a reasonable effort to update the voter rolls."  See Mem. ¶ 35.  Although Plaintiffs complained again at the motion hearing that Defendants are taking too long to remove from the voter rolls voters who have changed their residence, the NVRA envisions a careful and deliberate—i.e., not immediate—process.  See 52 U.S.C. § 20507(d)(1).

Plaintiffs' real objection is to Defendants' failure to purge voters in response to Plaintiffs' demands that they do so.  See, e.g., Drouillard Aff. ¶ 19 ("On Friday, September

---

[19] Section 20507(c)(1) in fact states that "[a] State may meet the requirement of subsection (a)(4) by establishing a program under which . . . change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed."  This is just what Defendants appear to do.

27, 2024, after I prompted her a third time, Defendant Roberts responded but failed to address the issue of ineligible voters despite being able to easily corroborate it on her own, consistent with her duty to investigate all such claims.").  But Defendants did not have in September of 2024—and certainly do not have now, in November of 2024—an obligation to purge voters from the voter rolls in response to Plaintiffs' inquiries.

To the contrary, it is clear under the NVRA that "[a] State shall complete, not later than 90 days prior to the date of a . . . general election. . . any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters."  See 52 U.S.C. § 20507(c)(2)(A); see also U.S. Dep't of Justice, Voter Registration List Maintenance: Guidance under Section 8 of the National Voter Registration Act, 52 U.S.C. § 20507 (Sept. 2024) at 4 (90-day quiet period "applies to list maintenance programs based on third-party challenges derived from any large, computerized data matching process.").  While there are exceptions in place that allow for removal within the 90-day period for certain reasons, the "change of residence of the registrant" is not one of those reasons.  See 52 U.S.C. § 20507(c)(2)(B) (90-day period "shall not be construed to preclude" removal "at the request of the registrant," "by reason of criminal conviction or mental incapacity," or "the death of the registrant"); see also Republican National Committee v. Francisco Aguilar, 2024 WL 4529358, at *8 ("the ninety-day prohibition from removing names of ineligible voters from official lists applies only to those voters who are being removed due to a change of address."); Arcia v. Detzner, 908 F. Supp. 2d 1276, 1282 (S.D. Fla. 2012) ("registrants who become ineligible because of a change in residence may not be removed during the 90-day period."), reversed on other grounds by Arcia v. Florida Sec'y of State, 772 F.3d 1335 (11th Cir.

1    2014).[20][21]   The reason Congress chose not to allow for systematic removal of voters

---

[20] A state may also remove, within the 90-day period, a voter from its voter rolls based on an individualized, rather than systematic, process. See Mi Familia Vota v. Fontes, 691 F. Supp. 3d 1077, 1093 (D. Ariz. 2023). But Plaintiffs' process here in identifying the 89 and 994 voters was based on software that compared "the database used by the Postal Service, [NCOA] database, with the active voter rolls in Marin County." Drouillard Aff. Ex. E ¶ 5. That is a systematic, rather than individualized, process. See Arcia, 772 F.3d at 1344 (individualized assessment would rely on "individualized information or investigation to determine which names from the voter registry to remove"; process that used "a mass computerized data-matching process to compare the voter rolls with other state and federal databases" was systematic).

[21] The Court recognizes that there is some question as to whether a state can remove noncitizens from its voting rolls within 90 days of an election. Compare RJN Ex. E (dkt. 22-5) (Supreme Court order in Beals v. VA Coalition for Immigrant Rights staying E.D. Va. order that would have blocked Virginia from removing alleged noncitizens from voter rolls within 90 days of election) with Mi Familia Vota, 691 F. Supp. 3d at 1092–93 (systematic removal of noncitizens violates 90-day quiet period). However, this case is not about noncitizens. See FAC (dkt. 9) ¶ 8 (case is about voters who moved out of state).

Beals is without question a case about purported noncitizens. See RJN Ex. A (dkt. 22-1) (Virginia Executive Order No. 35) at 4 (re comparing lists of non-citizens to voter rolls); RJN Ex. B (dkt. 22-2) (VA Coalition for Immigrant Rights Complaint in Beals ) ¶ 2 ("In a purported effort to flag potential noncitizens . . ."); RJN Ex. C (dkt. 22-3) (government Complaint in Beals) at 4 (re "Virginia's Process to Remove Alleged Noncitizens"); Virginia Coalition for Immigrant Rights v. Beals, No. 24-2071, 2024 WL 4601052, at *1 (4th Cir. Oct. 27, 2024) (rejecting argument that "the Quiet Period Provision does not cover noncitizens at all"); RJN Ex. D (dkt. 22-4) (Emergency Application for Stay) at 1 (framing district court order below as ordering Appellants "to place over 1,600 self-identified noncitizens back onto Virginia's voter rolls" and "forcing noncitizens back on the ballot" based on "a provision of the [NVRA] that does not even apply to the removal of noncitizens and other voter registrations that are void ab initio."), 14 ("The NVRA's Quiet Period Provision does not apply to removal of noncitizens.").

Even the Defendants in Beals recognized that "a voter could become ineligible because he has moved away," and that the quiet period in the NVRA "restricts programs with the purpose of systematically removing voters—those who voted or had the legal right to vote but who are no longer qualified to vote." Opp'n to MPI (dkt. 92) at 24 in Virginia Coalition for Immigrant Rights v. Beals, Case No. 1:24-cv-01778 (E.D. Va. Oct. 22, 2024) (cleaned up). The Defendants there argued that noncitizens "are not 'voters' at all," and so the quiet period does not apply to the purging of nonvoters from voter rolls. Id. at 24–25 ("Therefore, States are free to systematically remove noncitizens, minors, and fictitious persons within 90 days of an election without running afoul of the NVRA."). In their Emergency Application for a Stay before the Supreme Court, Appellants argued that the 90-day quiet period did not apply to removal of noncitizens, but they also stated: "The Quiet Period Provision incorporates three of the four exceptions from the General Removal Provision. . . . It does not permit removing registrants based on a change in residence." RJN Ex. D at 16 (emphasis added); see also id. at 20 ("the Quiet Period Provision restricts programs with the 'purpose' of 'systematic[ally] removing voters—those who 'vote[d] or ha[d] the legal right to vote,' but who are no longer 'qualified' to vote in a given election (for instance, because they moved to a different jurisdiction).") (emphasis added).

Whether or not the quiet period applies to the removal from voting rolls of noncitizens, there is no real debate as to whether it applies to the removal from voting rolls of citizens

1    within 90 days of an election is that "[i]n the final days before an election . . . the calculus

2    changes" and "[e]ligible voters removed days or weeks before Election Day will likely not

3    be able to correct the State's errors in time to vote."  Arcia, 772 F.3d at 1346.

4        Because Defendants have programs in place that "make a reasonable effort" to

5    remove the names of ineligible voter from the voter rolls, and because Plaintiffs seek a

6    systematic removal of voters within 90 days of the General Election based on their change

7    of address, Plaintiffs are unlikely to prevail on their NVRA claim.

8                              c.    HAVA

9        The FAC alleges that "HAVA establishes error rate limits for voting systems and

10   requires each state to maintain accurate voter rolls by regularly removing ineligible

11   voters."  FAC ¶ 19 (citing 52 U.S.C. § 21081(a)(5)).  It then alleges that "[t]he excessive

12   number of ballot errors generated by votes case by ineligible voters in Marin County

13   exceeds the error rate permitted under HAVA."  Id. ¶ 20.  In seeking a TRO, Plaintiffs

14   elaborate a bit, stating that HAVA permits "only one voting system error per 500,000

15   ballot positions," and that "Defendants' failure to remove ineligible voters has generated

16   an excessive number of ballot errors in Marin County elections historically and is almost

17   certainly going to for the impending election."  Mem. ¶¶ 36, 37 (citing 52 U.S.C. §

18   21081(a)(5) and section 3.1.2 of the voting system standards issued by the Federal Election

19   Commission).

20       HAVA does not create a private right of action.  See Order (dkt. 53) at 10 in

21   Paralyzed Veterans of Am. v. McPherson, Case No. C 06-4670 SBA (Nov. 28, 2006)

22   ("HAVA does not itself create a private right of action.") (citing Sandusky Cnty.

23   Democratic Party v. Blackwell, 387 F.3d 565, 572 (6th Cir. 2004); Taylor v. Onorato, 428

24   F. Supp. 2d 384, 386 (W.D. Pa. 2006); Florida Democratic Party v. Hood, 342 F. Supp. 2d

25   1073, 1077 (N.D. Fla. 2004)); see also Crowley v. Nevada ex rel. Nevada Sec'y of State,

26   678 F.3d 730, 736 n.4 (9th Cir. 2012) ("case law casts doubt on [assumption that Congress

27

28   _____

     who have relocated.

United States District Court
Northern District of California

intended to create a private right of action under HAVA]) (citing <u>Brunner v. Ohio Republican Party</u>, 555 U.S. 5, 6 (2008) (per curiam); <u>Sandusky</u>, 387 F.3d at 572)).

Even if HAVA created a private right of action,[22] Plaintiffs' interpretation of HAVA is flawed.  HAVA provides that "The error rate of the voting system in counting ballots . . . shall comply with the error rate standards established under section 3.2.1 of the voting systems standards issued by the Federal Election Commission."  52 U.S.C. § 21081(a)(5).  But HAVA specifically defines a "voting system" as "the total combination of mechanical, electromechanical, or electronic equipment (including the software, firmware, and documentation required to program, control, and support the equipment)" used in voting and "the practices and associated documentation used" "to identify system components," "to test the system during its development and maintenance," "to maintain records of system errors and defects," "to determine specific system changes to be made to a system after the initial qualification of the system," and "to make available any materials to the voter."  52 U.S.C. § 21081(b).  The applicable Federal Election Commission standards also relate to equipment.  <u>See</u> <u>Voting System Standards Volume 1: Performance Standards</u>, Federal Election Commission (April 2002) at §§ 3.1 (re "machines and manufactured devices that are part of a voting system"), 3.2.1 (re accuracy requirements for a voting system); <u>see also</u> <u>id.</u> § 1.5.1 (defining "Voting System").[23]  Plaintiffs' interpretation of 52 U.S.C. § 21081(a)(5) as applying to voter rolls, or ballots cast by ineligible voters, has no basis in the statute.

Accordingly, Plaintiffs are unlikely to prevail on a HAVA claim.

Because Plaintiffs have not demonstrated that they are likely to prevail on any of their claims, they have not satisfied <u>Winter</u>, 555 U.S. at 20.  The Court nonetheless addresses the other <u>Winter</u> factors.

---

[22] Plaintiffs stated at the motion hearing that they do not seek a private right of action.
[23] Available at https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf (last visited Nov. 1, 2024).

#### 4.      Irreparable Harm

A TRO is not warranted absent a showing that "irreparable injury is likely in the absence of an injunction."  Winter, 555 U.S. at 20.  A party claiming irreparable harm must establish that remedies available at law, such as monetary damages, are inadequate to compensate them for their harm.  See Herb Reed Enter., LLC v. Fla. Ent. Mgmt., Inc., 736 F.3d 1239, 1249–50 (9th Cir. 2013).

Plaintiffs argue that that they will suffer irreparable harm if the Court fails to grant the TRO: "Plaintiffs do not assert their right to win the election; they assert their right to a fair election and the voters' right to cast an accurate and valid vote."  Mem. ¶ 38.  They argue that "The loss of these rights satisfies the irreparable harm requirement."  Id. (citing Elrod v. Burns, 427 U.S. 347, 373 (1976) (loss of constitutional rights even for minimal rime is irreparable injury), Fla. Democratic Party v. Hood, 342 F. Supp. 2d 1073 (N.D. Fla. 2004) ("A person who is denied the right to vote suffers irreparable injury.")).  And they add that "[d]ilution of the right to vote, just as a complete denial of an eligible vote, is irreparable harm."  Id. ¶ 39.

But "the inadvertent counting of some invalid ballots, without more, does not limit, prevent, or otherwise burden the ability of any voter to cast a lawful ballot consistent with their voting preference."  Election Integrity Project California, 113 F.4th at 1089.  The Ninth Circuit has rejected this vote dilution theory and held that "[t]he burden on the right to vote [that Plaintiffs allege] is . . . no burden at all."  See id.  Because "the fundamental 'right to vote'" is not "at stake in [this] action," Plaintiffs have not demonstrated irreparable harm.  See Marchant v. New York City Bd. of Elections, 815 F. Supp. 2d 568, 578 (E.D.N.Y. 2011).

Plaintiffs have not demonstrated that they face a likelihood of irreparable harm absent preliminary relief.  See Winter, 555 U.S. at 20.

#### 5.      Balance of Equities and Public Interest

The remaining Winter factors are the balance of equities and the public interest. See Winter, 555 U.S. at 20.  In weighing the balance of equities, the Court must consider

the seriousness of the injuries that could result to either side if the Court grants or denies the requested relief.  Id. at 26.  As for the public interest, the Court may only grant injunctive relief if "the public interests" that favor granting it "outweigh other public interests that cut in favor of not issuing" it.  Alliance for the Wild Rockies, 632 F.3d at 1138.

Plaintiffs argue that the balance of equities tips in their favor because "[o]n the one side are plaintiffs' constitutional rights, and on the other, there is absolutely no inequity.  Defendants are being asked to do their job."  Mem. ¶ 40.  This argument is unpersuasive, as the Court concludes that Plaintiffs' constitutional rights are not being impacted, see Election Integrity Project California, 113 F.4th at 1089, and that Defendants are already doing their job.  There is therefore no injury to Plaintiffs if the Court denies injunctive relief.  On the other hand, notwithstanding Plaintiffs' assertions at the motion hearing that their requested relief would not disrupt the vote counting process, the evidence before the Court is that "[i]f the [C]ourt were to grant the relief requested, it would severely disrupt [Marin County's] ability to process the remaining ballots received," Roberts Decl. ¶ 12.  Roberts "would have to immediately halt the processing of all ballots," her staff "would have to manually search through 25,000 to 35,000 envelopes to locate the appropriate ballots," which "would take approximately three days if [the] full staff participated."  Id.  Roberts states that "In the 2020 election, [she] was able to certify the election one day prior to the deadline, with [her] staff working weekends."  Id.  She "does not believe it would be possible to halt ballot processing for three days and meet the required certification deadline for this election."  Id.  This leads the Court to discussion of the public interest factor.

Plaintiffs argue as to the public interest that Plaintiffs "and the People of Marin County all have an interest in a fair election which reflects their vote accurately."  Mem. ¶ 41.  Plaintiffs fail to persuade the Court that their desired injunction would serve the public interest—particularly as Plaintiffs have failed to show that the election process is fundamentally unfair.  Moreover, courts have long recognized that "election cases are

24

different from ordinary injunction cases. . . . Interference with impending elections is extraordinary" and "interference with an election after voting has begun is unprecedented." Southwest Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 919 (9th Cir. 2003) (en banc); see also Arizona Democratic Party v. Hobbs, 976 F.3d 1081, 1086 (9th Cir. 2020) ("as we rapidly approach the election, the public interest is well served by preserving Arizona's existing election laws, rather than by sending the State scrambling to implement and to administer a new procedure for curing unsigned ballots at the eleventh hour").  Administering an election is "complicated and difficult."  See Merrill v. Milligan, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring) (adding that "state and local election officials need substantial time to plan for elections.").  Roberts has articulated just how disruptive Plaintiffs' desired injunctive relief would be to the administration of this election.  Roberts Decl. ¶ 12.  The public interest is not served by this Court ordering Defendants to intercept and sequester ballots, enjoin Defendants from opening, processing, or counting ballots, or issuing AVMR-130 reports.  Defendants have an election to administer—pursuant to federal and California law, and without interference from this Court.

Accordingly, Plaintiffs have not demonstrated that the balance of equities tips in their favor or that an injunction is in the public interest.  See Winter, 555 U.S. at 20.

## IV.    CONCLUSION

Because Plaintiffs lack standing and fail to meet the requirements for injunctive relief, the Court DENIES their application for a TRO.

**IT IS SO ORDERED.**

Dated: November  4, 2024

_____
CHARLES R. BREYER
United States District Judge